UNITED STATES of America,
Plaintiff–Appellee,

v.

Lloyd BRADLEY, Defendant–Appellant.

No. 89–6335.

United States Court of Appeals,
Sixth Circuit.

Argued July 30, 1990.

Decided Jan. 10, 1991.

Joe B. Brown, U.S. Atty., Hal McDonough, Asst. U.S. Atty., Robert Washko, Asst. U.S. Atty. (argued) Office of the U.S. Atty., Nashville, for plaintiff-appellee.

Dale Quillen, Nashville, Tenn., Richardson R. Lynn (argued), Pepperdine University School of Law, Malibu, Cal., for defendant-appellant.

Before KEITH and KRUPANSKY, Circuit Judges, and JORDAN, District Judge.[*]

JORDAN, District Judge.

The defendant Lloyd Bradley appeals his conviction for unlawful possession of Schedule II narcotics in violation of 21 U.S.C. § 841(a)(1) and for unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). The defendant entered conditional guilty pleas in the Middle District of Tennessee and was sentenced to 92 months, to be served consecutively to a sentence he was then serving.

On appeal, the defendant contends that the District Court erred in failing to suppress evidence obtained during a consensual search of his house following his arrest at home without a warrant; the defendant also challenges the sentence imposed in the District Court, arguing that the District Court erred in calculating his Criminal History Category under the Sentencing Guidelines. For the reasons that follow, we reverse and remand this case to the District Court for further proceedings.

## I.

### A.

On July 27, 1988, the defendant was indicted by the Grand Jury for White County, Tennessee, for possession of controlled substances in violation of State law.[1] On the same date, an Assistant District Attorney for the judicial circuit in which the indictment was returned gave written instructions to a Tennessee Bureau of Investigation (TBI) agent, Larry O'Rear, and to the White County Sheriff, William Hickey, to arrest the defendant. No warrant or other process was issued for this arrest. The TBI agent had a photocopy of the indictment with him, with the District Attorney's attached instructions to pick the defendant up. The TBI agent testified that it was standard practice to arrest persons on the basis of an indictment without a warrant. An agent of the Federal Bureau of Investigation (FBI), Burl Smith, accompanied the two State officers to the defendant's house to make the arrest. The defendant's house was several miles outside the town of Sparta, Tennessee, on Highway 84. They arrived at about 2:00 p.m., driving to the rear of the defendant's house.

The agents could see the defendant through sliding glass doors at the rear of his house; the defendant was sitting in the room watching television when the officers arrived. The officers knocked on the door and were met by the defendant at his door. The defendant recognized the Sheriff and may have recognized the TBI agent. Almost immediately upon the defendant's answering the door, the officers informed him that he was under arrest on an indictment

---

[*] The Honorable Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

[1.] The defendant was not indicted on federal charges until August 10, 1988.

for narcotics violations. The officers read the defendant his *Miranda* rights and then asked the defendant if they could search his house. The defendant agreed to allow the officers to conduct a search, after being informed of his right to refuse to permit the search, and executed a consent to search form. The defendant accompanied the officers as the search proceeded through the house. The officers found various controlled substances as well as a number of firearms. The search took several hours to complete.

Following the consensual search of the defendant's home after his arrest, the officers took the defendant to the White County Jail intake center for processing. He remained detained in the White County Jail for several days and on July 29, 1988, FBI agent Smith went to speak to the defendant in jail to ask permission to search the defendant's house a second time. Again the defendant was told of his right to refuse to permit the search and the defendant agreed to allow a second search, volunteering that the officers had missed finding some marijuana and telling them were it was hidden. The second search was conducted and the marijuana was found in the exact location where the defendant stated that it would be.

The defendant was subsequently indicted by a federal grand jury on six counts for the possession and distribution of controlled substances and for possession of firearms by a convicted felon. The defendant moved to suppress the evidence seized as the result of the search conducted on July 27, 1988. The District Court for the Middle District of Tennessee denied the motion to suppress upon the findings that the defendant executed valid waivers and consented to the search.

### B.

Following the denial of the motion to suppress, the defendant entered a plea of guilty on counts two and six of the indictment on August 15, 1989. On October 16, 1989, the defendant was sentenced to serve 92 months consecutively to a sentence he was then serving, followed by a period of supervised release of five years. At the sentencing hearing, the defendant contended that his criminal history category was miscalculated because one of the State convictions on which his criminal history category was calculated was invalid. He argued that he was not properly advised of his rights under State law and thus did not enter a valid guilty plea. Furthermore, the defendant contended that the sentence that he received for his conviction was improper under State law. The defendant also argued that the District Court erred in determining that he had the ability to pay the fine assessed at the time of sentencing. He continues to assert these arguments on appeal.

Under the Sentencing Guidelines, the defendant was calculated to have an offense level of 26 with a criminal history category of IV based on a State misdemeanor conviction to which he entered a plea of guilty. The defendant attempted to attack the facial validity of this State conviction at the sentencing hearing, contending that the State trial judge did not conform to the requirements of State law in taking the plea and improperly sentencing him to a term of probation exceeding that authorized under the statute. The defendant points out that the State trial court failed to advise him of the penalties for the offense to which the plea was offered. A transcript of the plea in State court was read into the record at the sentencing hearing and at no time was the defendant advised of the possible penalties for the charge. Furthermore, the State·statute under which he was charged, T.C.A. § 39–6–907, did not authorize a sentence of eleven months and twenty-nine days, which was the term of probation to which he was sentenced by the State court. Under T.C.A. § 39–6–911, violations of § 39–6–907 were punishable at that time by a fine of between $100.00 and $500.00 and by a term of not more than six months confinement.

The District Court found that the defendant voluntarily entered a plea of guilty to the State offense. As a level 26, criminal history category IV, offender, the Guideline range was 92 to 115 months. If the

defendant were reclassified as a level 26, criminal history category III, offender, the Guideline range is 78 to 97 months.

## II.

### A.

Although the District Court concluded that the defendant voluntarily consented to the search of his house, the District Court incorrectly concluded that the arrest of a person in his home without a warrant, absent exigent circumstances and regardless of the existence of probable cause, is permitted under the law of Tennessee. The analysis of this issue should have started with the validity of the defendant's arrest at home without a warrant. Under *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), a person may not be arrested at home without a warrant, regardless of the existence of probable cause, absent exigent circumstances; moreover, in the present case, the validity of a warrantless arrest is determined by reference to State law. *See Johnson v. United States*, 333 U.S. 10, 15, n. 5, 68 S.Ct. 367, 370 n. 5, 92 L.Ed. 436 (1948).

Under the law of the State of Tennessee, officers are required to obtain a warrant to effect a valid arrest of a person in that person's own home. Not only does Rule 9 of the Tennessee Rules of Criminal Procedure require in explicit terms that "[a]fter the return of an indictment or presentment by the grand jury, the clerk shall issue a capias or a criminal summons for each defendant named in the indictment or

presentment who is not in actual custody," but that rule must be read in the context of Tennessee constitutional law that has for numerous years required that officers obtain warrants or other authorizing process before entering private, occupied lands for the purpose of making an arrest or conducting a search, regardless of the existence of probable cause.[2] As the Supreme Court of Tennessee held in *Lucarini v. State*, 159 Tenn. 373, 19 S.W.2d 239, 240–241 (1929), "[a] man's home is his castle, and cannot be invaded or searched without a warrant. The courts of the land have uniformly discountenanced all attempts on the part of officers to evade this sacred right upon various pretexts and subterfuges." The *Lucarini* court characterized the actions of the officers in that case as a trespass. *Id.*, 19 S.W.2d at 240. This characterization has been applied consistently by Tennessee courts, with but few exceptions. In *Murphy v. State*, 194 Tenn. 698, 254 S.W.2d 979, 981 (1953), the Court reiterated the long-standing rule in Tennessee that " '[a]n arrest by an officer without a warrant is not justified by the fact that the officer had information leading him to believe that an offense was being committed.' " (Citation omitted.) The *Murphy* court noted that the warrant was the source of the officer's authority to effect the search and seizure.[3]

More recently, the Tennessee Supreme Court has reaffirmed the rule in that State that "[a] search or seizure without a warrant is presumptively unreasonable and invalid.... The right to search or seize

---

**2.** In addition to the warrant requirement, all process issued by the courts in Tennessee must "bear test and be signed by the respective clerks." Article VI, § 12, Constitution of Tennessee. *See State Department of Revenue v. Moore*, 722 S.W.2d 367, 370–371 (Tenn.1986). In *Moore*, the State Supreme Court also noted that under Tennessee law a district attorney general is not authorized to issue any process by which a court obtains jurisdiction over a person and went on to emphasize that "[t]he [State] Constitution prohibits general searches and, with great particularity, limits the powers of the government when engaging in criminal investigations." *Id.*, at 373. An indictment with a note from the District Attorney instructing police officers to pick up the defendant does not conform to the requirements of either Rule 9 of

the State Rules of Criminal Procedure or to Article VI, § 12, of the State Constitution. *Cf. Coolidge v. New Hampshire*, 403 U.S. 443, 447–448, 91 S.Ct. 2022, 2028–2029, 29 L.Ed.2d 564 (1971) (Issuance of search warrant by prosecuting State Attorney General acting as a justice of the peace invalid).

**3.** For a full discussion of the history of the law of search and seizure in Tennessee, see *State v. Jennette*, 706 S.W.2d 614, 623–628 (Tenn.1986) (Drowota, J., dissenting). Justice Drowota makes it clear that the invasion of private property by officers lacking a warrant is unreasonable under Article I, § 7, of the Tennessee Constitution.

without a warrant is the exception, and it exists only under exceptional circumstances.... It has been said that the test is the apparent need for summary seizure and that when the securing of a warrant is reasonably practicable, it must be used." *Fuqua v. Armour*, 543 S.W.2d 64, 66 (Tenn.1976). In condemning the seizure of an automobile from a defendant's premises in *Fuqua*, the Tennessee Supreme Court stated unequivocally that

> "[w]e cannot countenance a seizure without a warrant of an automobile from the owner's premises when the officers had a period ... following its alleged [illegal] use ... within which to obtain a warrant. Just as a presentment was obtained for [the defendant's] arrest, so could a warrant authorizing the seizure of his automobile have been obtained in the period ... intervening between ... the offense and the arrest and seizure." *Id.*, at 68.

Continuing, the Court emphasized that "[t]he fact that probable cause exists for seizure is not enough; there must also exist exigent circumstances" to justify a summary seizure. Likewise, the Tennessee Court of Criminal Appeals has held that

> "[i]t is settled law that police officers may not enter a suspect's house to arrest based upon probable cause unless they have a valid warrant or there are exigent circumstances excusing the necessity of obtaining a warrant.... Indeed, the sheriff sought a warrant, but failed to follow the requirements of the Tennessee Rules of Criminal Procedure. Thus the entry into the appellant's home to arrest him was illegal."

*State v. Burtis*, 664 S.W.2d 305, 308 (Tenn. Cr.App.1983) (citation omitted). In virtually every Tennessee case that has permitted a warrantless arrest on occupied, private property (not just within a house itself), exigent circumstances have existed to justify the warrantless intrusion regardless of the existence of probable cause.

Under Tennessee law, the return of an indictment by a grand jury is one method of initiating a criminal prosecution and the issuance of the indictment clearly establishes probable cause to believe that a crime has been committed by the person named in it, *Jones v. State*, 206 Tenn. 245, 332 S.W.2d 662, 667 (1960), and among the purposes of an indictment are to inform the accused of the charge or charges alleged to have been committed, to state facts sufficient to support a conviction, and to give a court jurisdiction for the prosecution, *State v. Hughes*, 212 Tenn. 644, 371 S.W.2d 445, 447 (1963). Little Tennessee authority has been found, however, that permits a person to be arrested in his own home on the basis of an indictment without the issuance of process authorizing the arrest, despite the existence of probable cause, absent exigent circumstances. Although *Howard v. State*, 599 S.W.2d 280 (Tenn.Cr.App.1980), does state that T.C.A. § 40–803(3) [now codified at T.C.A. § 40–7–103] permits a warrantless arrest in a person's home, even in the absence of exigent circumstances, *id.*, at 282 (relying on *Garner v. State*, 4 Tenn.Cr.App. 189, 469 S.W.2d 542 (1971)), the *Howard* court found that exigent circumstances did exist in that case; moreover, *Howard* and *Garner* are in direct conflict with controlling authority of the State Supreme Court. *See, e.g., Lucarini v. State, supra; Fuqua v. Armour, supra.*[4]

---

**4.** The State Court of Criminal Appeals did note in *Howard* that *Payton v. New York* was pending before the United States Supreme Court at the time of its decision but believed that *Howard* was distinguished by the existence of exigent circumstances. *Payton*, however, has been characterized as a *per se* rule that does not yield but to exigent circumstances. *See Payton*, 445 U.S. at 603–604, 100 S.Ct. at 1388–1389 (White, J., dissenting). *See also United States v. Shye*, 492 F.2d 886, 891 (6th Cir.1974) (per curiam). Moreover, the cases relied on by the State court in *Howard* involved arrests in public places or under exigent circumstances. *Howard* cannot

be reconciled with *Lucarini* or *Fuqua*. The only other case vaguely supporting the view of Tennessee law announced in *Howard* is *Alley v. State*, 218 Tenn. 497, 404 S.W.2d 493 (1966). *Alley* did involve an arrest without a warrant in the home of one of the defendants but the rationale of the case is clearly based on the fact that the officers were first brought to the house by complaints of disorderly conduct and then discovered that an offense was occurring in their presence. *Id.* 404 S.W.2d at 498. *Fuqua*, however, is clear that if the officers have the opportunity to obtain a warrant, they are required to do so. *Fuqua* is entirely consistent

■ In the present case, the officers could have easily obtained a warrant to arrest the defendant and they did not do so. No exigent circumstances appear that would excuse the warrant requirement for making an arrest at home. In fact, when the officers arrived at the defendant's house, he was clearly unaware that he had been indicted and was watching television, demonstrating that he was not planning to flee. The officers could easily have obtained a warrant since the indictment established the existence of probable cause. The procedure followed by the officers in this case was fatally defective. It failed to comply with the requirements of the Constitution of Tennessee and the Tennessee Rules of Criminal Procedure. Consequently, the arrest of the defendant was illegal under Tennessee law.

Furthermore, this Court has itself recognized that "[a]bsent exigent circumstances, police officers may not enter an individual's home or lodging to effect a warrantless arrest or search." *United States v. Morgan,* 743 F.2d 1158, 1161 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). Even when the officers have probable cause to make an arrest but no exigent circumstances exist, " '[w]here, as here, officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search [or arrest] warrant,' " *id.,* at 1162, and "[p]olice officers may not, in their zeal to arrest an individual, ignore the fourth amendment's warrant requirement merely because it is inconvenient. . . ." *Id.,* at 1163–1164. The securing of a warrant is not a mere formality or technicality. *Id.,* at 1168. *See also McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed.

153 (1948). As Justice Marshall stated in his dissent in *United States v. Santana,* 427 U.S. 38, 48, 96 S.Ct. 2406, 2412, 49 L.Ed.2d 300 (1976), "the power to arrest is an awesome one and is subject to abuse." *See also Coolidge v. New Hampshire,* 403 U.S. 443, 477–478, 91 S.Ct. 2022, 2043–2044, 29 L.Ed.2d 564 (1971) (an arrest is more serious and radical than a search).[5]

■ The government contends that since a grand jury returned the indictment, a grand jury being an impartial body that substitutes for the function of a magistrate, and the indictment establishes the existence of probable cause, the omission of the officers should be overlooked as harmless error. To characterize such a fundamental failure as the omission to obtain a warrant to invade private property as harmless error is to ignore the purposes of Article I, § 7, of the Tennessee Constitution and of the Fourth Amendment to the United States Constitution. It is a result-oriented logic that permits a court to justify the intrusion by what is found by the search rather than to apply the requirements of the law regardless of the outcome.[6] The search and seizure provisions of the State and federal Constitutions not only prescribe the proper procedure to be used by officers but provide substantive protections to the people of the State and of the United States from unauthorized intrusions into privacy by officers. As the Second Circuit stated in *United States v. Jarvis,* 560 F.2d 494, 497 (2d Cir.1977), *cert. denied,* 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978), "[e]ven where an indictment has been handed down and there is a presumption of probable cause, a warrant requirement remains." (Citing Rule 9, Fed.R.Crim.P.) The United States Su-

---

with *Lucarini* and *Lucarini* has never been overruled. Even absent the federal rule announced in *Payton,* the arrest of the defendant at home without authorizing process would be illegal under Tennessee law.

**5.** This Circuit has long recognized that "the warrantless entry of a dwelling to arrest was put on the same constitutional footing as warrantless entry of a dwelling for a search. . . . Entry in both instances is *per se* unreasonable unless 'exigent circumstances' justify the failure to ob-

tain a warrant." *United States v. Shye, supra,* at 891.

**6.** In the context of Article I, § 7, of the Tennessee Constitution, Justice Drowota of the Tennessee Supreme Court made this observation: "Such after-the-fact review of cases permits a result-oriented analysis that rationalizes the validity of the search by what is found rather than on the purposes of the Constitutional protections from warrantless intrusions." *State v. Jennette, supra,* at 627 (Drowota, J., dissenting).

preme Court has recognized that the protections of the Fourth and Fifth Amendments are to be liberally construed " 'to prevent stealthy encroachment upon or "gradual depreciation" of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly over-zealous executive officers.' " *Johnson v. United States, supra,* 333 U.S. at 17, n. 8, 68 S.Ct. at 370, n. 8 (citation omitted). To apply the harmless error rule to such a basic flaw in the actions of the officers in this case would be just the very gradual depreciation referred to in *Johnson.* Courts are to guard against the small encroachments of rights as well as the more egregious; rather, the small encroachments are worse since they imperceptibly wear away the protections of the Constitution, permitting " '[a] close and literal construction [that] deprives them of half their efficacy, and lead[ing] to gradual depreciation of the right, as if it consisted more in sound than in substance.' " *Coolidge v. New Hampshire, supra,* 403 U.S. at 454, 91 S.Ct. at 2031 (1971) (citation omitted).[7]

■ Consequently, the defendant's consent to search was tainted by an illegal arrest under State law. In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the United States Supreme Court reexamined the application of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), noting that consent to search must be " 'sufficiently an act of free will to purge the primary taint' " from an illegal arrest. 422 U.S. at 602, 95 S.Ct. at 2261. The mere fact that a suspect illegally seized has been given his *Miranda* warnings or has been told of the right to refuse to consent to a search does not "assure in every case that the Fourth Amendment violation has not been unduly exploited." *Id.,* at 603, 95 S.Ct. at 2261.

In this case, no time intervened between the arrest and the search, the evidence is that the defendant was under the influence of prescription drugs (although the extent to which this impaired him is not clear), and the officers clearly intended to attempt to search the defendant's home before arriving, which the officers candidly admitted. The fact that the defendant so readily agreed to permit the search when he knew that he had contraband in plain view does indicate that he was either intimidated by the arrest or that he was sufficiently under the influence of medication such that he was vulnerable to suggestion or coercion by the officers.[8] The Court is thus of the opinion that the taint of the illegal arrest could not have dissipated at the time that the officers obtained consent. Considering the totality of the circumstances and the flagrancy of the officers' conduct, the government failed to carry its burden of showing that the defendant's consent was voluntarily given following the defendant's illegal arrest. *See United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1299–1300 (9th Cir.1988); *United States v. Taheri,* 648 F.2d 598, 601 (9th Cir.1981).

■ The evidence found on the day of the defendant's arrest must, therefore, be suppressed; however, the evidence found at the time of the search two days later, when the FBI agent obtained consent to search a second time, is not suppressible because the taint of the illegal arrest had sufficiently dissipated and the defendant had been brought before a judicial officer as well as been informed of his rights, before this consent was obtained and voluntarily given by the defendant.

### B.

The defendant also challenges the sentence that was imposed. He contends that the District Court erred in concluding that he was properly placed in a criminal history category IV but does not challenge the offense level of 26. The defendant argued in the trial court that a State misdemeanor

---

**7.** As the Supreme Court observed in *Coolidge,* "[i]n times of unrest, whether caused by crime or racial conflict or fear of subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some." *Id.,* 403 U.S. at 455, 91 S.Ct. at 2032.

**8.** The defendant also suffers from Parkinson's Disease.

conviction was invalid on its face and thus should not have been included in the calculation of his criminal history category. The defendant attempted to attack the validity of his misdemeanor sentence and conviction in the State court at the sentencing hearing, contending that the State sentence was in excess of that authorized under State law and that he had not been properly advised of the penalties for the offense or of the enhancement possibility at the time that he entered his plea of guilty in the State court. He also contends that the fine was imposed without a showing of an ability to pay, contrary to the requirements of § 5E1.2(d)(2) of the Sentencing Guidelines.

■ The burden is on the defendant to show that a prior conviction used to calculate his criminal history category is invalid. *United States v. Dickens*, 879 F.2d 410, 412 (8th Cir.1989). Application note 6 to § 4A1.2 of the Sentencing Guidelines provides that "[c]onvictions which the defendant shows have been constitutionally invalid may not be counted in the criminal history score." *See also United States v. Davenport*, 884 F.2d 121, 124 (4th Cir. 1989). In *United States v. Landry*, 709 F.Supp. 908, 913 (D.Minn.1989), a defendant was permitted to attack the validity of a prior conviction at a guidelines sentencing hearing.

Although the government contends that the State conviction was entered upon a valid guilty plea, relying on *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), the validity of a plea under Tennessee law as of 1983, the year of the defendant's misdemeanor conviction, was determined by *State v. Mackey*, 553 S.W.2d 337 (Tenn.1977), which goes beyond the requirements of *Boykin* and mandates that a court accepting a guilty plea in Tennessee must inform the defendant of the nature of the charge, the penalties (including any enhancement due to prior convictions), the right to an attorney, the rights to persist in a plea of not guilty and to a trial by jury, to confrontation, and against self-incrimination. The record of the plea must demonstrate that the defendant was fully informed of his rights and of the consequences of entering a plea of guilty as well as show a factual basis for the conviction and show that the trial court was satisfied that the defendant understood the nature of the plea and of the waivers of constitutional rights. 553 S.W.2d at 340–341.

■ Despite the contentions of the defendant in the present case that he was not informed of the possibility that the charge to which he was offering to plead could be used against him in the future, at the time of the taking of his guilty plea in State court in 1983, a State court was not required to advise a defendant that the charge to which he was pleading could be used against him in the future. This requirement was not imposed under Tennessee law until 1987 in *State v. McClintock*, 732 S.W.2d 268 (Tenn.1987), which explicitly states that this decision is to be applied only to cases pending or to cases arising subsequently. *Id.*, at 274. As the Fourth Circuit noted in *Davenport, supra*, revised rules of criminal procedure cannot be used to attack a conviction otherwise valid under prior rules. 884 F.2d at 123.

Nevertheless, that portion of the plea colloquy read into the record at the sentencing hearing reveals that the State court failed to advise the defendant of the penalties for the misdemeanor charge to which he was offering to plead. The record thus reveals that the plea was invalid under *Mackey*. The government failed to have read any portion of the State plea record that indicated that the defendant was properly advised of the penalties for the offenses with which the defendant was charged in the State court. The defendant, therefore, carried his burden of showing that the plea itself was invalid under State law in effect at the time of the plea. The Court need not reach the issue of whether the defendant was properly sentenced under State law since the plea is invalid on its face.

The District Court, therefore, improperly used this State misdemeanor conviction to calculate the criminal history category. The defendant should have been sentenced as a criminal history category III, offense

level 26 offender, which carries a range of 76 to 97 months. The District Court imposed a sentence of 92 months, the minimum range at which the defendant could have been sentenced as a criminal history category IV, offense level 26 offender.

 The record is clear, however, that the defendant did not carry his burden of showing that he was unable to pay his fines imposed by the District Court. *See* § 5E1.2(f). From the record as it stands on this issue, the findings of the District Court concerning the fine are not clearly erroneous. This contention thus has no merit. The District Court found that, based on the Presentence Report, the defendant had the ability to pay. The defendant put on no proof that he no longer had such an ability.

### III.

Accordingly, the District Court erred in determining that the motion to suppress should not have been granted as to the evidence found on the day of the defendant's arrest; however, the District Court was not required to suppress evidence found as the result of a consensual search two days after the defendant's illegal arrest, as the taint of that arrest had clearly dissipated and the consent was voluntarily given to the FBI agent at that time. The District Court also erred in sentencing the defendant as a criminal history category IV, offense level 26 offender, when the record showed that the plea on which the conviction was based was invalid under State law; the defendant, therefore, should have been sentenced as a criminal history category III, offense level 26 offender. The District Court did not err in finding that the defendant had the ability to pay the fines imposed in the absence of any proof to the contrary. The judgment of the District Court for the Middle District of Tennessee is, therefore, REVERSED IN PART and AFFIRMED IN PART and the case is REMANDED for further proceedings consistent with this Opinion.

KRUPANSKY, Circuit Judge, dissenting.

Although I am aware of the sanctity of the home against unreasonable searches and seizures, the majority opinion is not supported by the law or the facts of the case. I must respectfully dissent.

An indictment, " 'fair upon its face,' and returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause and requires the issuance of an arrest warrant without further inquiry." *Gerstein v. Pugh*, 420 U.S. 103, 118, n. 19, 95 S.Ct. 854, 865, n. 19, 43 L.Ed.2d 54 (citations omitted). Because an indictment requires the issuance of an arrest warrant without further inquiry, this substitution of the grand jury's judgment for that of a neutral and detached magistrate "is attributable to the grand jury's relationship to the courts and its historical role of protecting individuals from unjust prosecution." *Id.* (citations omitted).

Tennessee recognizes that the indictment establishes probable cause in Rule 9(a) of the Tennessee Rules of Criminal Procedure:

(a) Issuance: After the return of an indictment or presentment by the grand jury, the clerk shall issue a capias or a criminal summons for each defendent named in the indictment or presentment who is not in actual custody.... The clerk shall issue a criminal summons instead of a capias *upon the request of the district attorney general* or by direction of the court. Upon like request or direction he shall issue subsequent process for the same defendant. He shall deliver the capias or criminal summons to the sheriff or other person authorized by law to execute or serve it.

(b) Form. The form of the capias shall be the same as that for an arrest warrant and shall be signed by the clerk. The capias shall describe the offense charged and it shall command that the defendant be arrested and brought before the court in which the charge was pending. The criminal summons shall be in the same form as the capias except that it shall summon the defendant to appear before the court at a stated time and place and shall give notice to the defendant that his failure to appear as

ordered shall constitute contempt of court.

(c) Execution; Return. The capias and criminal summons shall be executed and served as provided in Rule 4(d). The peace officer executing a capias shall make return thereof to the court. At the request of the district attorney general any unexecuted capias shall be returned and cancelled.

(d) Reissuance. At the request of the district attorney general made at any time while the indictment is pending, or upon its own initiative, the court may direct the clerk to deliver to the sheriff or other authorized person for execution or service a capias returned unexecuted and not canceled....

*Tennessee Code Annotated*, Court Rules Annotated, Rule of Criminal Procedure 9 (Michie 1990).

Thus, once the indictment is returned, the issuance of the capias is merely a ministerial function of the court clerk. The district attorney is vested with authority to determine whether a capias or summons shall issue, to cancel an unexecuted capias, and to reissue a capias or summons.

In the instant case, the arresting police officers, an agent for the Tennessee Bureau of Identification (TBI) and the sheriff for White County, Tennessee, had brought with them a copy of the indictment when they arrived at the defendant's home. The local district attorney had endorsed the indictment with instructions to arrest the defendant and suggested a bond of $100,000. Probable cause had been proven to the satisfaction of the grand jury as evidenced by the indictment, and the district attorney had determined that the defendant should be arrested rather than summoned. The only element missing in this arrest equation was the rote issuance of the capias itself by the clerk of courts, who performs this function as an instrument of the district attorney. Under these circumstances, the clerk's ministerial act does not afford additional protection against unreasonable seizures, and, under the law of Tennessee, the indictment carried by the officers was tantamount to a warrant of arrest.

Apart from the foregoing legal resolution of this controversy, the facts of this case do not support the reasoning of the majority disposition. For purposes of fourth amendment analysis, the critical point in time was the instant that Bradley met the police officers at the door to his residence. Absent exigent circumstances, the fourth amendment prohibits "the police from making a warrantless and *nonconsensual* entry into a suspect's home in order to make a routine felony arrest." *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 1375, 63 L.Ed.2d 639 (1980) (emphasis added). The voluntariness of consent must be determined by examining all the surrounding circumstances, and "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of mind of the person who consents." *Schneckloth v. Bustamonte*, 412 U.S. 218, 229, 93 S.Ct. 2041, 2049, 36 L.Ed.2d 854 (1973)

Although the majority opinion asserts that the officers informed Bradley of his arrest "[a]lmost immediately upon the defendant's answering the door," the record of the testimony is to the contrary. Burl Smith, the Federal Bureau of Investigation agent who accompanied the two state officers, testified that the defendant was not immediately taken into custody. Rather, when Bradley came to the door the officers requested permission to enter his home to speak with him. Bradley recognized the sheriff and the TBI agent. He *invited* the officers to enter his residence. It was not until *after* the officers were in the house that Bradley was advised he was under arrest. The police officers displayed no weapons and exerted no coercion. The majority opinion conjectures that Bradley was vulnerable due to his medicated state, but this ignores Bradley's voluntary cooperation during not just the first search at his house, but during the second search, which took place after he had been in jail several days. Under the totality of the circumstances presented here, Bradley consented to the police officers' entry into his house.

It is no "result-oriented logic" that compels the conclusion that the fruits of the

concedingly consensual search should not be suppressed. Rather, the majority opinion misconstrues the facts by elevating the importance of the clerk's rote act and deemphasizing Bradley's consent to the officers' entry. Bradley consented to the officers' entry and his arrest was legal. Thus, the arrest could not taint his consent to search, and the fruits of that search should not be suppressed.

Accordingly, I enter my dissent to the majority's disposition.